# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-0308-RMR-MEH

ERIC BRANDT,

     Plaintiffs,

v.

THE CITY AND COUNTY OF DENVER, a municipality;
FREDERICK KITCHENS, in his individual capacity;
ASHLEY COX, in her individual capacity,
CHRISTOPHER BAIRD, in his individual capacity,
JORDAN PETERSON, in his individual capacity,
ADOLPH CHAVEZ, JR., in his individual capacity;
ANTHONY GUZMAN, in his individual capacity; and
KENNETH D. CHAVEZ, in his individual capacity,

     Defendants.

---

## SECOND AMENDED COMPLAINT AND JURY DEMAND

---

Plaintiff Eric Brandt, by and through his attorneys David Lane and Andy McNulty of KILLMER, LANE & NEWMAN, LLP, respectfully allege for his Second Amended Complaint and Jury Demand as follows:

### INTRODUCTION

1.  On September 24, 2018, Mr. Brandt was exercising his free speech rights on a public sidewalk along the Sixteenth Street Mall in downtown Denver, Colorado. Mr. Brandt was protesting police misconduct and calling for an end to the urban camping ban (and downtown business interests' weaponization of that ban to criminalize homelessness). During his protest, Mr. Brandt shouted, "No Justice? No Peace! Fuck the Denver police!" Upon hearing these words, Denver Police Department ("DPD")

1

officers began conspiring as to how they could arrest Mr. Brandt for using words that offended them (under the guise that he was disturbing the peace). When Mr. Brandt's shouting and profanity annoyed the sensibilities of a passerby, DPD officers used the complaint to, within minutes, arrest and jail Mr. Brandt for his protected speech.

2.  Mr. Brandt was arrested, jailed, and charged with disturbing the peace, and both charges were ultimately dismissed. This was not the first time Mr. Brandt has been arrested by Denver police officers for exercising his rights. He is infamous within the Denver Police Department, and has been targeted on many previous occasions because he speaks out against police brutality and oppression. That targeting must end. Mr. Brandt brings this action to vindicate his rights under the First Amendment.

## JURISDICTION AND VENUE

3.  This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331.

4.  Jurisdiction supporting Plaintiff's claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

5.  Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this Second Amended Complaint.

## PARTIES

6.  At all times relevant to this complaint, Plaintiff was a citizen of the United States of America and resident of the State of Colorado.

7.     Defendant City and County of Denver ("Denver") is a Colorado municipal corporation.

8.     At all times relevant to this complaint, Defendant Frederick Kitchens was a citizen of the United States and a resident of the State of Colorado who was acting under color of state law in his capacity as a law enforcement officer employed by Denver.

9.     At all times relevant to this complaint, Defendant Ashley Cox was a citizen of the United States and a resident of the State of Colorado who was acting under color of state law in her capacity as a law enforcement officer employed by Denver.

10.     At all times relevant to this complaint, Defendant Christopher Baird was a citizen of the United States and a resident of the State of Colorado who was acting under color of state law in his capacity as a law enforcement officer employed by Denver.

11.     At all times relevant to this complaint, Defendant Jordan Peterson was a citizen of the United States and a resident of the State of Colorado who was acting under color of state law in his capacity as a law enforcement officer employed by Denver.

12.     At all times relevant to this complaint, Defendant Adolph Chavez Jr. was a citizen of the United States and a resident of the State of Colorado who was acting under color of state law in his capacity as a law enforcement officer employed by Denver.

13.     At all times relevant to this complaint, Defendant Anthony Guzman was a citizen of the United States and a resident of the State of Colorado who was acting under color of state law in his capacity as a law enforcement officer employed by Denver.

14.     At all times relevant to this complaint, Defendant Kenneth D. Chavez was a citizen of the United States and a resident of the State of Colorado who was acting under color of state law in his capacity as a law enforcement officer employed by Denver.

## FACTUAL ALLEGATIONS

**Defendants unlawfully arrest Plaintiff for criticizing the DPD.**

15.     On September 24, 2018, Mr. Brandt went to observe the arraignment of Brian Loma and Mickel Whitney at the Denver City And County Building. Mr. Loma and Mr. Whitney were arrested by DPD officers, including Defendants Frederick Kitchesn, Christopher Baird, Adolf Chavez, and Kenneth Chavez, for saying the word "fuck" while demonstrating against Denver's criminalization of homelessness on the Sixteenth Street Mall in downtown Denver, Colorado. Mr. Brandt believed that these arrests were unconstitutional and went to show his support for Mr. Loma and Mr. Whitney.

16.     Mr. Brandt is well-known to DPD officers. He has been demonstrating against police brutality and oppression for many years in Denver. Because of his penchant for speaking out in opposition of the police, he has been arrested numerous times by DPD officers. These arrests have stemmed from his carrying of signs that are critical of police officers or speaking out (in very provocative terms) against police

4

misconduct. Often DPD officers weaponize civilians and induce them to file complaints against Mr. Brandt in an attempt to justify their arrests even though civilian complaints cannot provide a basis for arresting an individual for engaging in First Amendment-protected activity.

17.    After watching the arraignment, Mr. Brandt walked down the Sixteenth Street Mall. He began speaking and demonstrating. Mr. Brandt spoke out in support of Mr. Loma and Mr. Whitney, and against their unlawful arrests. He also engaged in speech against police misconduct and the criminalization of homelessness (including Denver's Urban Camping Ban). While speaking, Mr. Brandt carried a sign that read "Fuk Killa Kops" and "only cops keep the bad apples." Mr. Brandt livestreamed his protest on YouTube.

18.    As Mr. Brandt walked down the Sixteenth Street Mall and continued his protest, he encountered a group of DPD officers, including Defendants Frederick Kitchens, Ashely Cox, Christopher Baird, and Jordan Peterson. When he saw them, he began to chant, "No Justice? No Peace! F*ck the Denver Police!" from approximately fifteen feet away. Mr. Brandt's speech criticizing law enforcement irked Defendants Kitchens, Cox, Baird, and Peterson, and they began to concoct a reason to arrest Mr. Brandt and silence him.

19.    As Mr. Brandt continued his demonstrations, passersby expressed support, cheered, laughed, and took photographs and videos. Other passersby expressed disapproval.

20.    One passerby, Sylvia Cosgriff, saw and heard Mr. Brandt and stated to the officers that Mr. Brandt was "disturbing the peace."

5

21.   In response, Defendant Kitchens told Ms. Cosgriff that if she signed a complaint against Mr. Brandt that he would be "happy" to arrest Mr. Brandt. Defendants Kitchens, Cox, Baird, and Peterson saw this as an opportunity to silence Mr. Brandt, despite knowing that simply speaking out in public against police brutality (and using profanity while doing so) is core First Amendment protected speech.

22.   Despite it being obvious to all of the officers on-scene that Mr. Brandt was engaging in First Amendment protected speech, and that there was clearly no probable cause to believe he was disturbing the peace (let alone committing any other crime), Defendant Kitchens conspired with Ms. Cosgriff to obtain a written complaint, which he would then use to arrest and silence Mr. Brandt.

23.   Defendant Cox then approached Ms. Cosgriff and induced her to write a complaint against Mr. Brandt that the officers could use as justification to arrest him. In reality, there was no reasonable suspicion, let alone probable cause, to believe that Mr. Brandt had committed any crime. Mr. Brandt was being watched the entire time by Defendants Kitchens, Cox, Baird, and Peterson. Defendants Kitchens, Cox, Baird, and Peterson knew the complaint by Ms. Cosgriff, which alleged Mr. Brandt was disturbing the peace by speaking out about police misconduct, was bogus.

24.   While Defendant Cox obtained Ms. Cosgriff's written complaint, Defendants Kitchens and Baird immediately approached Mr. Brandt and seized him physically and informed him that he was under arrest. Defendants Kitchens and Baird then physically seized Plaintiff's smart phone and terminated Mr. Brandt's live YouTube broadcast.

25.     Defendants Kitchens, Baird, and Peterson then engaged in an invasive search of Plaintiff's person and clothing. There was no reasonable suspicion to believe that Plaintiff was armed and dangerous, or that he had committed a crime, when he was searched by Defendants Kitchens, Baird, and Peterson. After searching Mr. Brandt, they handcuffed him, placed him in the patrol car, and placed his effects in the trunk.

26.     Shortly thereafter, Defendant Adolf Chavez, Jr. arrived at the scene in his patrol car. Upon information and belief, prior to arriving on-scene, Defendant Chavez, Jr. drove past the Mr. Brandt's demonstration. Defendant Chavez, Jr. saw and heard the majority of Mr. Brandt's prtest. When Defendant Chavez, Jr. arrived on scene, Defendant Kitchens informed him of Mr. Brandt's arrest for disturbing the peace. He also detailed the basis for Mr. Brandt's arrest: namely, that he had been using the word fuck, criticizing the police, and that one woman had complained that she was offended by Mr. Brandt's speech.

27.     Despite knowing that Mr. Brandt's arrest was clearly unconstitutional, Defendant Chavez, Jr. reacted with joyful exuberance over Mr. Brandt's arrest and did nothing to intervene to stop Mr. Brandt's illegal arrest, search, and incarceration. It was clear to Defendant Chavez, Jr. that Mr. Brandt's arrest was in direct retaliation for his experession of First Amendment-protected speech, yet Defendant Chavez, Jr. did nothing to intervene.

28.     Over the radio Defendant Chavez, Jr. informed Defendant Anthony Guzman, Sr., about Mr. Brandt's arrest and the entire basis for it. Defendant Guzman explained that just one citizen complaint is sufficient to support the arrest even if the underlying conduct is not illegal.

7

29.     Defendants Chavez, Jr. and Guzman then informed Defendant Kenneth Chavez of Mr. Brandt's arrest and the entire basis for it: namely, that he had been using the word fuck, criticizing the police, and that one woman had complained that she was offended by Mr. Brandt's speech.

30.     Defendants Guzman and Kenneth Chavez did nothing to intervene to stop Mr. Brandt's illegal arrest, search, and incarceration despite knowing that these actions were taken in direct retaliation for his experession of First Amendment-protected speech

31.     Defendants Kitchens and Baird transported Mr. Brandt to the detention center and booked him. Mr. Brandt was charged with one count of disturbing the peace under Denver Revised Municipal Code 38-89(a). Mr. Brandt was in jail for three days before he was released on bond on September 26, 2018.

32.     On September 28, 2018, the prosecutors assigned to Mr. Brandt's case filed a motion to dismiss the charges against Mr. Brandt and the court granted the motion to dismiss the charge with prejudice in Mr. Brandt's favor. The charges were dropped by the prosecutors because the prosecutors determined there was no probable cause to believe Mr. Brandt had committed any crime.

33.     Defendants' actions and arrest of Mr. Brandt was motivated by their desire to prevent Mr. Brandt from exercising his First Amendment rights.

34.     Defendants arrested Mr. Brandt based on the content of his speech. Had he said a word other than "fuck" he would not have been arrested. Had a passerby not been offended by his speech, he would not have been arrested.

35.     Defendants also arrested Mr. Brandt based on the viewpoint of his speech. Had he shouted messages supporting the police or Denver's treatment of its homeless residents, he would not have been arrested.

36.     By charging Mr. Brandt with crimes without any legal basis to do so, Defendants participated in the malicious prosecution of Mr. Brandt. Defendants were motivated by an improper purpose to punish Mr. Brandt in an effort to divert attention from their own misconduct and to insulate themselves from civil liability.

**One day before Mr. Brandt is arrested, Denver police officers (including a number of the officers who unlawfully arrested Mr. Brandt) arrest Brian Loma and Mikel Whitney for the exact same conduct that Mr. Brandt was arrested: criticizing the police on the Sixteenth Street Mall.**

37.     On the morning of September 23, 2018, the day before Mr. Brandt was arrested, Mr. Loma and Mr. Whitney were standing on the Sixteenth Street Mall with a coalition of advocates distributing meals to the homeless on a public sidewalk outside of Corner Bakery, located at 500 16th Street, Denver, Colorado. The meal distribution was coupled with a peaceful protest calling for an end to the criminalization of homeless individuals.

38.     Caryn Sodaro was also there distributing meals and protesting when she was stopped and arrested for trespass. Ms. Sodaro stated that she was never made aware of a trespass notice that prevented her from being on the property. Many DPD officers were dispatched and present during Ms. Sodaro's arrest, including Defendants Guzman and Kitchens.

39.     When Ms. Sodaro was being escorted in handcuffs to the patrol vehicle, Mr. Whitney walked with Ms. Sodaro to the patrol vehicle to ensure her safe treatment as she was being detained. Mr. Whitney did not obstruct the officers' investigation.

9

40. After witnessing the injustice of Ms. Sodaro's arrest, around 11:00 a.m.,
Mr. Loma continued his protest on the Sixteenth Street Mall against the criminalization
of poverty and the inhumane treatment of homeless individuals. Mr. Loma protested
alone while walking through the pedestrian walkway in the 400 and 500 block of the
Sixteenth Street Mall.

41. Throughout Mr. Loma's protest, Defendants Guzman and Kitchens, along
with another officer, having been nearby for the arrest of Ms. Sodaro, were present
within the 400 and 500 block of the Sixteenth Street Mall, observing and listening to
Mr. Loma.

42. As Mr. Loma walked, he announced, "what we have here folks, is an
extension of the laws that criminalize people who can't pay rent. They don't want your
tourist dollars to recognize that we have problems in this city! The laws say that if
you're not paying money, you can't sit down. There's no water, there's no toilets!"

43. Throughout Mr. Loma's protest, Mr. Whitney stayed in the general
vicinity of Mr. Loma, observing his protest.

44. At all times, Mr. Whitney and Mr. Loma remained on public sidewalks (or
public, pedestrian walkways) on the Sixteenth Street Mall.

45. Mr. Loma had been protesting for about two minutes when he shouted,
"fuck the police!" After hearing this statement, Defendant Kitchens said to Defendant
Guzman, "isn't that disturbing the peace?" Defendant Guzman replied yes.

46. Mr. Loma continued protesting about the low wages of RTD workers and
the criminalization of the homeless. He then shouted, "seven million dollars and these
fuckers turn over the homeless…"

47.    Mr. Loma continued protesting for fair treatment of the homeless.

48.    Mr. Loma did not say any fighting words. Put differently, his words were
not calculated to provoke an immediate breach of the peace or a violent reaction.

49.    Dining outside on the patio of Earls Kitchen and Bar located at 1600
Glenarm Street, was a couple with their young child. The patio of Earls protrudes onto
the public sidewalk where there is an estimated three-foot tall, clear, glass separator
between the sidewalk and the patio tables. Any individual walking on the public
sidewalk within viewing angle of the patio, including standing on the other side of the
median walkway, can see patio patrons in public view. Passerby can walk on the public
sidewalk directly next to patrons dining on the patio, and patio-dining patrons are in
close proximity to the sights and sounds of the bustling Sixteenth Street Mall.

50.    Offended by Mr. Loma's shouting and few utterances of profanity, the
couple dining on the patio of Earls shouted at Mr. Loma to stop cussing because their
child was with them.

51.    At no point in time did Mr. Loma say anything directly to the couple, nor
did he acknowledge the couple or threaten them in any way.

52.    Upon hearing the couple complain and shout at Mr. Loma, Defendant
Guzman stated to Defendant Kitchens, "that's all we need"—insinuating that a citizen
complaint for Mr. Loma's protest would provide the probable cause needed to justify
Mr. Loma's arrest. Defendant Guzman then said to Defendant Kitchens, "ask them [the
couple dining on the patio] if they were offended."

53.    Defendants Guzman and Kitchens quickly approached Mr. Loma.
Defendant Kitchens arrested Mr Loma. Mr. Loma was handcuffed and cited for

disturbing the peace. While placing Mr. Loma in handcuffs, Defendant Kitchens stated, "*now* you can go to jail."

54.     Mr. Loma was arrested by Defendants Guzman and Kitchens without probable cause to believe that he had committed any crime.

55.     As Mr. Loma was being arrested, the male partner of the couple dining on the patio of Earl's loudly stated to the officers, "get him [Mr. Loma] the fuck out of here." That person was not arrested.

56.     During Mr. Loma's arrest, Defendant Guzman asked the couple seated on the patio of Earls if they would be willing to sign a complaint against Mr. Loma, to which the couple agreed.

57.     After being put in handcuffs, Mr. Loma was unjustifiably searched by Defendant Kitchens. Defendant Guzman watched Mr. Loma being unjustifiably searched, but did nothing to stop Defendant Kitchens from searching him.

58.     Mr. Loma was taken to Denver Justice Center by Defendant Adolph Chavez Jr., who was likewise nearby and watched Mr. Loma's protest and subsequent arrest and search while having no reasonable belief or probable cause to believe that Mr. Loma had committed any crime. Despite knowing the arrest was unsupported by probable cause and having many opportunities to intervene, Defendant Chavez, Jr. failed to do anything to stop the unlawful arrest, unconstitutional jailing, and unjustifiable search of Mr Loma. He instead took Mr. Loma to jail.

59.     Mr. Loma spent 36 hours incarcerated before he was released on bond.

60.     Throughout Mr. Loma's police encounter, Mr. Whitney stood on a public sidewalk and/or public pedestrian walkway away from the investigation. As a friend of

Mr. Loma's and a concerned public citizen, Mr. Whitney took pictures of Mr. Loma's arrest on his cell phone believing the officers were committing illegal acts of misconduct against Mr. Loma in relatiation for his protected speech.

61.     After Mr. Loma was arrested, Mr. Whitney walked in the direction of the couple still dining on the patio of Earls. Standing on a public sidewalk several yards away from the couple, he stopped and pointed his cell phone in their direction. In his effort to collect evidence regarding the complaints against Mr. Loma and the officers' subsequent unlawful arrest, Mr. Whitney attempted to document the couple and their location by taking a photo of them on the patio.

62.     As Mr. Whitney had his phone pointed toward the couple, Defendant Guzman saw Mr. Whitney and demanded he not to take a picture of them. Mr. Whitney put his phone down and calmly stated that he did not take a picture. Mr. Whitney was in fact unable to take a picture of the couple.

63.     Defendant Guzman told Mr. Whitney that he was harassing the couple. Mr. Whitney attempted to explain that he needed it to gather information about what occurred, but was unable to complete his sentence because an officer was speaking over him. To avoid the hassle, Mr. Whitney calmly stated that he was walking away. In response, Defendant Guzman retorted that Mr. Whitney was indeed going to walk away because the couple was ready to sign a complaint against him as well.

64.     Mr. Whitney walked away. As he walked, he turned and stated, "I did not take a fucking picture."

65.     At no point in time were Mr. Whitney's words or actions calculated to provoke an immediate breach of the peace.

66.     In response to this statement, Defendant Guzman immediately walked up to Mr. Whitney and arrested him without probable cause to believe that Mr. Whitney was about to, or had committed any crime. While arresting Mr. Whitney, another officer told Mr. Whitney to quit swearing.

67.     After being put in handcuffs, a DPD officer escorted Mr. Whitney further down the Sixteenth Street Mall towards the other DPD officers and an empty kiosk where he was then unjustifiably searched.

68.     Mr. Whitney was charged with disturbing the peace and taken to the Denver Justice Center, where he spent 36 hours incarcerated before he was released on bond.

69.     Defendant Kenneth Chavez was the supervisor for the other Defendants and was radioed by one of the officers and told about the situations surrounding Mr. Loma's and Mr. Whitney's First Amendment activities, their subsequent charges, arrests, searches, and detainment, and the citizen complaints obtained in support of their arrests.

70.     Based on what he was told, Defendant Kenneth Chavez knew that Mr. Loma and Mr. Whitney were engaged in protected First Amendment activity, and that their charges, arrests, searches, and detainment were a violation of their First and Fourth Amendment rights.

71.     Despite this knowledge, Defendant Kenneth Chavez gave his express approval to the Defendants for Mr. Loma's and Mr. Whitney's charges, arrests, searches, and jailing, and he personally caused Mr. Loma's and Mr. Whitney's continued arrest and detention.

72.     Both charges against the Plaintiffs were ultimately dismissed. Mr. Loma's charge was dismissed on February 6, 2019 and Mr. Whitney's charge was dismissed on January 24, 2019.

73.     Both Mr. Loma and Mr. Whitney were speaking out on a matter of public concern. Mr. Loma's protestations about the treatment of homeless individuals touches on significant political, social, and economic issues. Mr. Whitney's documenting of how DPD officers conduct arrests, and the bases for those arrest, also centers on issues of important political and social concern.

**Defendant Denver has a custom and practice of specifically targeting Mr. Brandt, and his associates, for arrest for engaging in First Amendment protected activity, and using citizen complaints to cover-up their unconstitutional actions.**

74.     There has been a pattern by DPD officers to solicit the participation of private persons to sign complaints against those expressing messages critical of law enforcement. It is a well-established pattern that has been used against him and his associated activists; indeed, he contends that it is so widespread that it constitutes a *de facto* custom and practice.

75.     The arrests of Mr. Loma and Mr. Whitney are an example of this customary behavior by DPD officers, which has been undertaken pursuant to a custom and practice DPD officers used the same approach of soliciting citizens to sign a complaint that they were offended by Mr. Loma's and Mr. Whitney's speech to be able to make an arrest. And, DPD officers, including Defendants Chavez and Defendant Guzman, approved the reliance on a private citizen's complaint of being offended by the messages expressed to arrest Mr. Whitney and Mr. Loma.

76.     Additionally, DPD officers solicited citizen complaints in another unlawful arrest, malicious prosecution, and violation of Mr. Brandt's First Amendment rights outside of the Lindsay-Flanigan Courthouse. Mr. Brandt was arrested by DPD officers for standing in the plaza square adjacent to the Lindsey-Flanigan Courthouse in Denver and asking people entering the courthouse whether they were reporting for jury duty. If any of these people answered affirmatively, then Mr. Brandt would hand them one or more brochures discussing the concept of jury nullification, which the brochures defined as the process by which a jury in a criminal case acquits the defendant regardless of whether he or she has broken the law in question. DPD officers solicited those who Mr. Brandt spoke with to write complaints against Mr. Brandt and then used those complaints to arrest him, Mr. Brandt's case went all the way to the Colorado Supreme Court and he won. Mr. Brandt's speech was protected by the First Amendment and he was arrested by DPD officers.

**Defendant Denver has a custom and practice of arresting Mr. Brandt for engaging in speech critical of law enforcement officers.**

77.     Defendant Denver has an informal custom or practice of arresting Mr. Brandt for engaging in speech that is critical of law enforcement officers.

78.     Mr. Brandt has been arrested approximately one dozen times by various DPD officers for engaging in speech that is critical of law enforcement.

79.     DPD officers and attempt to find any justification possible for Mr. Brandt's arrest because of his known penchant for criticizing law enforcement officers.

80.     DPD officers often arrest Ms. Brandt without justification, and this case is a salient example of that.

**Defendant Denver has a custom and practice of condoning its officers arrests
of those who demonstrate against police misconduct and those who would
dare to verbally oppose the police.**

81.     Defendant Denver has an informal custom or practice of condoning
unlawful arrests and other acts of retaliation by its officers that is based solely on the
exercise of First Amendment rights.

82.     For instance, on July 5, 2018, Susan Greene, a journalist, was driving to
the bank when she saw a black man handcuffed and naked on the sidewalk across from
the State Capitol Building surrounded by DPD officers. Concerned as a public citizen
and journalist by the questionable appearance of an African-American man unclothed,
unthreatening, and in handcuffs, Ms. Greene parked her vehicle and began to take
pictures on a public sidewalk where she was not obstructing police investigation. DPD
officers told her to stop. Ms. Greene stated that it was a public sidewalk and that she
had the right to take photos. The officers falsely accused Ms. Greene of violating the
arrestee's HIPAA rights and of blocking the door to an ambulance. The officers then
forcefully and painfully arrested Ms. Greene in retaliation for exercising her First
Amendment right to photograph the police on a public sidewalk, and handcuffed her for
ten minutes before releasing her. Ms. Greene was never charged with a crime. Ms.
Greene's First Amendment, First Amendment retaliation, and Fourth Amendment
excessive force claims against Denver and DPD officers were settled in August 2019 for
$50,000 in addition to mandating First Amendment training for DPD officers.

83.     On August 14, 2014, Levi Frasier witnessed DPD officers punch an
unarmed civilian numerous times in the head and trip a heavily pregnant woman,
causing her to fall to the ground. Believing the officers were committing illegal acts of

17

misconduct, Mr. Frasier video-recorded the officers with his tablet. Upon seeing Mr.

Frasier recording, DPD officers surrounded Mr. Frasier, threatened him with arrest, and

demanded he turn over his video. Mr. Frasier refused, and a DPD officer seized his

tablet from him and searched it illegally. On the plaintiff's motion to reconsider, Judge

Blackburn of the U.S. District Court for the District of Colorado reinstated the

plaintiff's First Amendment retaliation claims against the officer defendants and

granted Denver's motion for summary judgment. Despite Denver's policy and training

on the First Amendment, the officers nonetheless violated Mr. Frasier's First

Amendment right to gather and record information on matters of public concern.

84.    On September 23, 2018, shortly before Mr. Loma and Mr. Whitney's

arrests, Caryn Sodaro, an outspoken advocate for the homeless, was arrested by DPD

Officers for alleged trespassing while handing out meals to the homeless and protesting

on a public sidewalk on the Sixteenth Street Mall. Ms. Sodaro claimed she was never

provided with a trespass notice advising her that she was not permitted to be on the

property, and instead, officers arrested her in retaliation for engaging in First

Amendment protected activity. Ms. Sodaro was cited for trespass and detained at the

Denver Detention Center. Her case is currently ongoing.

85.    On May 28, 2020, Agazi Abay, Gabriel Thorn, Amy Schneider, Michael

McDaniel, and other similarly situated Plaintiffs protested in Denver to express their

outrage at the death of George Floyd and other acts of violence perpetrated by police

officers against the African American community. During the demonstration, DPD

officers violated the plaintiffs' First Amendment right to free speech and their Fourth

Amendment right against excessive force by using pepper spray, pepper balls, rubber

bullets, flashbang grenades, and tear gas to punish the plaintiffs for demonstrating against police brutality. On June 5, 2020, Judge Brooke Jackson of the U.S. District Court of the District of Colorado found the defendants in violation of the plaintiffs' First and Fourth Amendment rights and issued a temporary restraining order to enjoin Denver and DPD from employing chemical weapons or projectiles of any kinds against persons engaging in peaceful protest.

86.     In addition to the brutalization of protestors, DPD officers have also repeatedly used unlawful, excessive force against journalists in violation of the First Amendment. On June 1, 2020, members of the Colorado Freedom of Information Coalition, Colorado Press Association Network, Colorado Braodcastors Association, and Colorado Pro Chapter of the Society of Professional Journalists reported seven journalists or reporters had been subjected the to use of force by DPD officers while reporting on protests in Denver. DPD officers hit these reporters and with pepper balls, projectiles, or tear gas simply for being present at protests in violation of the First Amendment.

**Defendant Denver's customs and practices were deliberately indifferent and caused the violation of Mr. Brandt's constitutional rights.**

87.     Given Denver's history and widespread practice of unlawful arrests and excessive force in retaliation against the exercise of free speech rights, Defendant Denver knew of the need to provide additional or better training and supervision in this respect and made a deliberate choice to not adequately train and supervise DPD officers.

88.     Defendant Denver knew or should have known that its acts or omissions in this regard were substantially certain to cause DPD officers to violate individuals'

19

constitutional rights, and it consciously or deliberately chose to disregard this obvious

risk of harm in adhering to the policy and custom of failing to provide additional or

better training and supervision to DPD officers.

89.     Defendant Denver could have and should have pursued reasonable

methods for the training and supervising of such employees, or disciplining them if they

engaged in misconduct, but intentionally chose not to do so.

90.     Defendant Denver's customs and practices of encouraging, condoning,

and ratifying the use of arrests or other retaliatory conduct against those who exercise

their First Amendment rights, including Mr. Brandt specifically, and their customs and

practices of failing to properly train, supervise, and discipline DPD employees despite

such history and knowledge or constructive knowledge of such history, were the

moving force and proximate cause of the violations of Mr. Brandt's constitutional

rights.

91.     Defendant Denver engaged in this conduct intentionally, knowingly,

willfully, wantonly, maliciously, and in reckless disregard of Mr. Brandt's

constitutional rights.

92.     Defendant Denver's acts or omissions caused Ms. Brandt's damages

through their deprivation of liberty through retaliatory arrest and incarceration, and

where they suffered mental pain, humiliation, fear, anxiety, loss of enjoyment of life,

and sense of security and individual dignity, among other injuries, damages, and losses.

## STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
*42 U.S.C. § 1983 – First Amendment*
*Free Speech Violation*
(Against All Defendants)

93.     Plaintiff hereby incorporates all other paragraphs of this Second Amended
Complaint as if fully set forth herein.

94.     At all times relevant to this Second Amended Complaint, Defendants were
acting under the color of law.

95.     Uttering profanity is speech protected by the First Amendment to the
Constitution of the United States.

96.     Speaking on matters of public concern while standing on a public
sidewalk, without interfering with law enforcement operations, is speech protected by
the First Amendment to the Constitution of the United States.

97.     When Plaintiff was arrested and charged, he was standing in the middle of
the Sixteenth Street Mall on a public sidewalk, a traditional public forum, in Denver,
Colorado.

98.     Plaintiff did not violate any law in speaking on matters of public concern.

99.     Defendants did not at any time have a reasonable basis for believing that
Plaintiff was using violent or offensive language calculated to provoke a breach of the
peace. In other words, Defendants did not have a reasonable basis for believing that
Plaintiff was using fighting words – words which, by their very utterance inflict injury
or tend to incite an immediate breach of the peace.

100.    Plaintiff was arrested by Defendants because of his First Amendment
protected activity.

101.    Defendants failed to intervene to prevent other Defendants violation of
Plainitff's constitutional rights.

102.   Defendants' arrest of Plaintiff because of his First Amendment protected activity constitutes a content-based or viewpoint-based restriction on speech, or both.

103.   Defendants' arrest of Plaintiff was a denial of his right to free speech guaranteed by the First Amendment to the Constitution of the United States.

104.   By arresting Plaintiff and charging him with crimes without probable cause, Defendants prevented Plaintiff from speaking, observing, reporting on, documenting, and disseminating information relating to a matter of public concern.

105.   By arresting and jailing Plaintiff, Defendants prevented Plaintiff, and chilled him, from exercising his First Amendment rights.

106.   The actions of Defendants occurred while each was acting under color of State law.

107.   Defendants' conduct violated clearly established rights belonging to Plaintiff of which reasonable persons in Defendants' position knew or should have known. The freedom of individuals to oppose or challenge police action, and to criticize public officials, has been clearly established for over thirty years. *City of Houston v. Hill*, 482 U.S. 451 (1987).

108.   Defendants engaged in this conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

109.   Defendants acted pursuant to the custom, policy, and practice of Defendant Denver, which condones, tolerates, and ratifies its law enforcement officers' conduct of violating First Amendment rights. Defendants' violation of Plaintiff's First Amendment rights was in accordance with an informal custom and widespread practice of violating First Amendment rights in Denver, although not authorized by written law

or express policy, so permanent and well settled as to constitute a custom or usage with the force of law.

110.    Defendant Denver was aware of its employees' widespread violations of First Amendment rights, as detailed above, and failed to properly train, supervise, or discipline its employees regarding the First Amendment and First Amendment violations.

111.    Defendant Denver knew, or should have known, that its employees would violate First Amendment rights and would arrest, search, and cite Plaintiff, violating his constitutional rights.

112.    Defendant Denver's policies, customs, or practices condoning its employees' violation of First Amendment rights was the moving force and proximate cause of the violation of Plaintiffs' constitutional rights

113.    Defendants' actions and/or omissions caused, directly and proximately, Plaintiff to suffer damages. The acts and inactions of Defendants caused Plaintiff damages in that he suffered fear, anxiety, loss of enjoyment of life, and loss of sense of security and individual dignity during Defendants unlawful arrest, among other injuries, damages, and losses.

**SECOND CLAIM FOR RELIEF**
*42 U.S.C. § 1983 – First Amendment*
*Retaliation*
(Against all Defendants)

114.    Plaintiff hereby incorporates all other paragraphs of this Second Amended Complaint as if fully set forth herein.

115.    At all times relevant to this Second Amended Complaint, Defendants were acting under the color of law.

116.    Uttering profanity is speech protected by the First Amendment to the Constitution of the United States.

117.    Speaking on matters of public concern while standing on a public sidewalk, without interfering with law enforcement operations, is speech protected by the First Amendment to the Constitution of the United States.

118.    When Plaintiff was arrested and charged, he was standing in the middle of the Sixteenth Street Mall on a public sidewalk, a traditional public forum, in Denver, Colorado.

119.    Plaintiff did not violate any law in speaking on matters of public concern.

120.    Defendants did not at any time have a reasonable basis for believing that Plaintiff was using violent or offensive language calculated to provoke a breach of the peace. In other words, Defendants did not have a reasonable basis for believing that Plaintiff was using fighting words – words which, by their very utterance inflict injury or tend to incite an immediate breach of the peace.

121.    Plaintiff was arrested by Defendants because of his First Amendment protected activity.

122.    Defendants failed to intervene to prevent other Defendants violation of Plainitff's constitutional rights.

123.    Plaintiff was arrested in retaliation for his First Amendment protected activity.

124.    Defendants' retaliatory actions were substantially motivated by Plaintiff's exercise of his First Amendment rights.

125. By unlawfully arresting, charging, and booking Plaintiff into jail, Defendants sought to punish Plaintiff for exercising his First Amendment rights, to silence his future speech, and restrict his freedom of expression, and the future speech and expression of others. Defendants' retaliatory actions would chill a person of ordinary firmness from engaging in First Amendment-protected activity.

126. Defendants' conduct violated clearly established rights belonging to Plaintiff of which reasonable persons in Defendants' position knew or should have known. *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000).

127. Defendants lacked probable cause to arrest Plaintiff.

128. Defendants engaged in this conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

129. Defendants acted pursuant to the custom, policy, and practice of Defendant Denver, which condones, tolerates, and ratifies retaliation by its law enforcement officers against those exercising First Amendment rights. Defendants' retaliation was in accordance with an informal custom and widespread practice of retaliation in Denver, although not authorized by written law or express policy, so permanent and well settled as to constitute a custom or usage with the force of law.

130. Defendant Denver was aware of widespread retaliation by its law enforcement officers against individuals exercising their First Amendment rights, as detailed above, and failed to properly train, supervise, or discipline its employees regarding the First Amendment and First Amendment violations.

131.    Defendant Denver knew, or should have known, that their employees would retaliate against those exercising First Amendment rights and would retaliate in arresting and charging Plaintiff, violating his constitutional rights.

132.    Defendant Denver's policies, customs, or practices condoning its employees' retaliation against individuals who exercise their First Amendment rights was the moving force and proximate cause of the violation to Plaintiff's constitutional rights.

133.    Defendants' actions and/or omissions caused, directly and proximately, Plaintiff to suffer damages. The acts and inactions of Defendants caused Plaintiff damages in that he suffered fear, anxiety, loss of enjoyment of life, and loss of sense of security and individual dignity during Defendants unlawful arrest, among other injuries, damages, and losses.

### THIRD CLAIM FOR RELIEF
*42 U.S.C. § 1983 – Fourth Amendment*
*Unlawful Seizure / False Arrest*
(Against All Defendants)

134.    Plaintiff hereby incorporates all other paragraphs of this Second Amended Complaint as if fully set forth herein.

135.    At all times relevant to this Second Amended Complaint, Defendants were acting under the color of law.

136.    Defendants did not at any time have probable cause or reasonable suspicion, or any other legally valid basis, to believe that Plaintiff had committed or was committing any violation of the law prior to seizing and detaining him and continuing to restrain him.

137.    Defendants did not at any time have a reasonable basis for believing that Plaintiff was using violent or offensive language calculated to provoke a breach of the peace. In other words, Defendants did not have a reasonable basis for believing that Plaintiff was using fighting words – words which, by their very utterance inflict injury or tend to incite an immediate breach of the peace.

138.    Defendants did not at any time have a warrant authorizing any such seizure and detention of Plaintiff's bodies or his belongings.

139.    Plaintiff was unlawfully seized without probable cause to believe that he was about to, or had committed any crime.

140.    Defendants, acting in concert with one another, seized and detained Plaintiff and took him to Denver Justice Center on charges of disturbing the peace.

141.    At the time when Defendants arrested Plaintiff without probable cause and searched his person without reasonable suspicion, Plaintiff had a clearly established constitutional right under the Fourth Amendment to the United States Constitution to be secure in his person from unreasonable searches and seizures.

142.    Defendants acted pursuant to the custom, policy, and practice of Defendant Denver, which condones, tolerates, and ratifies its employees' arrests which lack probable cause and are based solely on lawful First Amendment conduct. Defendants' retaliatory arrests, which lacked probable cause and are based solely on lawful First Amendment conduct, were in accordance with an informal custom and widespread practice of unlawful arrests in Denver, although not authorized by written law or express policy, so permanent and well settled as to constitute a custom or usage with the force of law.

143.    Defendants engaged in this conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

144.    Defendant Denver was aware of widespread continued arrests, which lacked probable cause and are based solely on lawful First Amendment conduct, as detailed above, and failed to properly train, supervise, or discipline its employees regarding the Fourth Amendment.

145.    Defendant Denver knew, or should have known, that their employees would continue to effectuate arrests that lack probable cause and are based solely on lawful First Amendment conduct, and that this practice would cause Plaintiff's arrest.

146.    Defendant Denver's policies, customs, or practices condoning its employees' continued arrests, which lack probable cause and are based solely on lawful First Amendment conduct, was the moving force and proximate cause of the violation of Plaintiff's constitutional rights.

147.    Defendants' actions and/or omissions caused, directly and proximately, Plaintiff to suffer damages. The acts and inactions of Defendants caused Plaintiff damages in that they suffered fear, anxiety, loss of enjoyment of life, and loss of sense of security and individual dignity during Defendants unlawful arrest, among other injuries, damages, and losses.

### FOURTH CLAIM FOR RELIEF
*42 U.S.C. § 1983*
*Fourth Amendment Violation – Unlawful Search of Person*
(Against all Individual Defendants)

148.    Plaintiff hereby incorporates all other paragraphs of this Second Amended Complaint as if fully set forth herein.

149.   At all times relevant to this Second Amended Complaint, Defendants were acting under the color of law.

150.   Plaintiff has a legitimate expectation of privacy in his body and his property being free from unreasonable governmental search.

151.   Defendants did not at any time have probable cause or reasonable suspicion, or any other legally valid basis, to believe that Plaintiff had committed or were committing any violation of the law prior to seizing and detaining him and continuing to restrain him.

152.   Plaintiff was unlawfully searched by Defendants.

153.   Defendants did not at any time have a warrant authorizing any such search of Plaintiff or his belongings.

154.   Because Defendants' underlying arrests of Plaintiff was unsupported by probable cause and thereby unlawful, Defendants' subsequent search of Plaintiff, without independent legal justification for the search, was also unlawful.

155.   Defendants' actions were objectively unreasonable in light of the circumstances confronting them.

156.   Defendants' actions and/or omissions caused, directly and proximately, Plaintiffs to suffer damages. The acts and inactions of Defendants caused Plaintiffs damages in that they suffered fear, anxiety, loss of enjoyment of life, and loss of sense of security and individual dignity during Defendants unlawful arrest, among other injuries, damages, and losses.

### FIFTH CLAIM FOR RELIEF
*42 U.S.C § 1983*
*Malicious Prosecution – 14th Amendment Violation*
(Against all Individual Defendants)

157.   Plaintiff hereby incorporates all other paragraphs of this Second Amended Complaint as if fully set forth herein.

158.   At all times relevant to this Second Amended Complaint, Defendants were acting under the color of law.

159.   Defendants did not at any time have a reasonable basis for believing that Plaintiff was using violent or offensive language calculated to provoke a breach of the peace. In other words, Defendants did not have a reasonable basis for believing that Plaintiff was using fighting words – words which, by their very utterance inflict injury or tend to incite an immediate breach of the peace.

160.   Defendants, acting without probable cause, procured groundless charges of disturbing the peace against Plaintiff in order to maliciously bring about Plaintiff's criminal prosecution. This includes supervisory Defendants, who knew that Plaintiff was engaged in protected First Amendment activity, and that the charges, arrests, searches, and detainment were a violation of his First and Fourth Amendment rights.

161.   Defendants, acting knowingly, maliciously, willfully and wantonly, and evincing a complete and utter disregard for the First Amendment, participated in the institution of legal proceedings against Plaintiff, including promoting the continued criminal prosecution of Plaintiff with knowledge that there were no reasonable grounds to believe that Plaintiff had committed any crime whatsoever.

162.   Defendants acted knowingly, maliciously, willfully and wantonly by accusing Plaintiff of unlawful behavior prior to, and during his unlawful arrest.

163.   Without any legal basis to do so, Defendants participated in the malicious prosecution of Plaintiff.

164.    Both charges of disturbing the peace against the Plaintiffs were ultimately dismissed and terminated in Plaintiff's favor. The charges were dismissed because their was no probable cause to believe that Plaintiff had committed any crime.

165.    Defendants were motivated by an improper purpose to punish Plaintiff in an effort to divert attention from their own misconduct and to insulate themselves from civil liability.

166.    Defendants' conduct violated clearly established rights belonging to Plaintiff of which a reasonable person in their positions knew or should have known.

167.    Defendants' actions and/or omissions caused, directly and proximately, Plaintiffs to suffer damages. The acts and inactions of Defendants caused Plaintiffs damages in that they suffered fear, anxiety, loss of enjoyment of life, and loss of sense of security and individual dignity during Defendants unlawful malicious prosecution, among other injuries, damages, and losses.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, and award him all relief as allowed by law and equity, including, but not limited to the following:

a.  Declaratory relief and injunctive relief, as appropriate;

b.  Actual economic damages as allowed by law and as established at trial;

c.  Compensatory damages as allowed by law, including, but not limited to those for past and future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, medical bills, and other non-pecuniary losses;

d.  Punitive damages for all claims as allowed by law in an amount to be determined at trial;

e.  Issuance of an Order mandating appropriate equitable relief, including, but not limited to:

    i.  Issuance of a formal written apology from each Defendant to Plaintiff;

    ii.  The imposition of policy changes designed to avoid future similar misconduct by Defendants;

    iii.  Mandatory training designed to avoid future similar misconduct by Defendants;

f.  Pre-judgment and post-judgment interest at the highest lawful rate;

g.  Attorney's fees and costs; and

h.  Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED this 11th day of November 2021.

KILLMER, LANE & NEWMAN, LLP

*s/ Andy McNulty*
David A. Lane
Andy McNulty
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
dlane@kln-law.com
amcnulty@kln-law.com

*ATTORNEYS FOR PLAINTIFF*